UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ISAAC V. GOMEZ, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   No. 3:19-cv-00026 |
| | ) |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, | ) ) ) |
| | ) |
|     Defendant. | ) |

**MEMORANDUM OPINION**

Plaintiff Isaac Gomez ("Gomez") brought this action against Defendant Metropolitan Government of Nashville and Davidson County ("Metro"), asserting claims for national origin discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* and for disability discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* Pending before the Court is Metro's Motion for Summary Judgment (Doc. No. 36). Gomez filed a response (Doc. 43), and Metro filed a reply (Doc. No. 49). For the following reasons, Metro's motion will be denied as to Gomez's claims for hostile work environment and disability discrimination. The motion will otherwise be granted.

**I. BACKGROUND**

Gomez worked as an Office Support Representative III ("OSR III") for the Metro Public Health Department between May 2013 and June 2018. (Doc. Nos. 40 at 1; 43 at 2). In that role, he helped maintain Davidson County's birth records at the Medical/Vital Records Department located at the Lentz Public Health Center in Nashville. (Doc. No. 40 at 2). While Gomez, who is Hispanic, received positive performance reviews for his work, (Doc. Nos. 47 at 2; 48), he was also, according

to his supervisor, Ms. Shonn Smith, often late or absent from his desk for long periods of time. (Doc. No. 36-3). As his tardiness and absences became more commonplace, Metro began to scrutinize them more closely. (Doc. Nos. 36-3; 46 at ¶ 5). For purposes of this action, Gomez claims that Metro's scrutiny – namely by Ms. Smith and her supervisor, Ms. Tonya Foreman – constituted unlawful discrimination against him for being Hispanic as well as for various physical and mental health issues. (Doc. Nos. 17 at ¶ 6; 43). According to Gomez, his tardiness and absences were caused by gastrointestinal issues requiring frequent and prolonged use of the restroom. (Id.). Gomez claims these physical ailments were caused by mental health issues arising from difficult circumstances in his personal life outside of work, including prolonged divorce proceedings. (Doc. No. 46 at ¶ 4).

From December 1, 2016 until January 13, 2017, Ms. Smith placed Gomez into a "coaching plan" to "address the frequency and length of time [Gomez was] away from his desk." (Doc. Nos. 36-3; 46 at ¶ 5). Gomez argues the plan was embarrassing and intrusive, as Ms. Smith closely monitored the amount of time he spent in the restroom. (Doc. No. 43 at 2-3). Gomez, along with his co-worker Renee Burford, suggest that Ms. Smith singled out Gomez for criticism despite other employees' consistent tardiness. (Id.; Doc. Nos. 44 at ¶ 7; 45 at ¶ 8). Nevertheless, Gomez's attendance issues persisted amidst the coaching plan, and, around March 30, 2017, Metro officially reprimanded him for developing a "pattern of failing to report to work through excessive absenteeism, tardiness, and unreliability." (Doc. No. 46 at ¶ 2; Doc. No. 36-3).

After Metro issued its reprimand, Gomez met with his supervisors and a union representative. (Doc. Nos. 36-3; 46 at ¶ 3). Following the meeting, Gomez submitted a letter explaining that his physical and mental health issues prompted his absenteeism and tardiness. (Id.). Gomez alleges that Ms. Smith's scrutiny of him continued, leading to embarrassment and a

2

constant invasion of privacy. (Doc. No. 43 at 4). He eventually lodged a formal Employee Complaint against Ms. Smith for creating a hostile work environment, (Doc. No. 47-4), but a subsequent HR investigation did not corroborate his claims. (Doc. No. 36-6 at 2). Gomez maintained that his mental and physical health continued to worsen due to both his unsuccessful HR complaints as well as his continued mistreatment by Ms. Smith. (Doc. 43 at 4). In September 2017, Metro suspended Gomez for two weeks for "abus[ing] the complaint procedures of the Metro Public Health Department," for being "disruptive, dishonest, disrespectful," and for intending "to harass [his] supervisor." (Doc. No. 36-6).

Gomez alleges that Ms. Smith's continued scrutiny of his tardiness and absenteeism was founded on unlawful discrimination of his national origin and disability. (Doc. No. 43). On November 8, 2017, Gomez received an email from Ms. Smith's account with the subject heading "I hate," and the body of the message reading "Hispanic [sic] like you." (Doc. No. 47-7). Gomez alleges the email embodied Ms. Smith's underlying animus toward him and contributed to her constant scrutiny of his bathroom use. (Doc. No. 43 at 10). Metro's HR department investigated the email and found it "highly unlikely" that Ms. Smith sent it. (Doc. Nos. 46 at ¶ 7; 36-3). The parties dispute the timeliness of Metro's investigation but do not dispute its conclusions. (Doc. No. 46 at ¶¶ 6-7). Shortly thereafter, Ms. Smith left the Medical/Vital records department for another supervisory position with Metro. (Doc. No. 46 at ¶ 8).

Gomez alleges that despite Ms. Smith's departure, Metro's discriminatory practices continued. (Doc. No. 17 at ¶ 8). On April 5, 2018, Gomez lodged another complaint requesting that disciplinary action be taken against the Director of the Medical/Vital Records department, Ms. Tonya Foreman, based upon national origin and disability discrimination. (Id.). Gomez believes that Metro's continued discrimination exacerbated his medical conditions, and he subsequently

3

submitted a doctor's note recommending he be allowed off work under the Family Medical Leave Act ("FMLA"). (Doc. Nos. 17 at ¶ 9; 37). The parties dispute the original return date from FMLA leave, but do not dispute that, following a mediation, Gomez returned to work on May 1, 2018. (Doc. No. 46 at ¶ 29; 37-2). Gomez alleges that his doctor's note suggested he remain off work until June 19. (Id.; Doc. No. 46 at ¶ 32). Metro alleges that because Gomez exhausted all of his FMLA leave, he had to return on May 1. (Doc. No. 46 at ¶¶ 27-29). As part of the parties' mediation, Metro HR Manager, Les Bowron requested that Gomez return to work at the MPHD East Clinic in Madison rather than the Lentz Public Health Center, due to the tense workplace climate surrounding Gomez, Foreman, and others. (Doc. Nos. 37-2; 43 at 15; 46 at ¶ 30).

Gomez declined Bowron's request and reported to work at Lentz on May 1. However, Metro would not permit him to enter the facility because it interpreted Bowron's request as requiring Gomez's transfer to the East Clinic. (Doc. No. 46 at ¶ 21). When Gomez resisted the move to the East Clinic, Bowron informed him that, should he fail to report to the East Clinic for three consecutive days, he would be deemed to have abandoned his job. (Id.; Doc. No. 39-4). Gomez eventually reported to the East Clinic. (Doc. No. 46 at ¶ 17). Following his return, Gomez alleges that his worsening health issues persisted, and, after providing a doctor's note for his ailments, stopped coming to work completely after May 10, 2018. (Id. at ¶ 20). On May 15, 2018, Gomez applied for additional leave "indeterminately." (Doc. Nos. 38-2; 46 at ¶ 18). Having exhausted all of his available FMLA leave, however, Metro declined his request. (Doc. No. 46 at ¶ 18).

In a June 6, 2018 Decision Letter, Metro dismissed Gomez, when he abandoned his job by failing to report for three consecutive days. (Doc. No. 37-2). The letter also found that Gomez violated several civil service rules, including: 1) prohibitions on outside employment, arising from

4

Gomez's alleged conflict of interest in opening a restaurant while working as a Metro employee; and 2) prohibitions on absence without leave, notification, or approval, arising from his failure to seek prior approval before missing work on several days in May after exhausting his FMLA leave. (Doc. No. 49 at 4). Gomez alleges the grounds for his dismissal were "mere pretext for unlawful national origin and disability discrimination and for unlawful retaliation." (Doc. No. 17 at 5-6). He also alleges that his termination constituted improper retaliation by Metro in response to his April 5, 2018 complaint of national origin and disability discrimination. (Doc. No. 43 at 14-15). Metro has now moved for summary judgment.

## II.  LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Griffith v. Franklin Cty., 975 F.3d 554, 566 (6th Cir. 2020) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (citation and internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the

matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

**III. ANALYSIS**

Gomez asserts claims for national origin discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Doc. Nos. 1, 17) and for disability discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* (Id.). The Court will discuss each of these claims below.

    **A. Title VII**

        **1. National Origin Discrimination**

Gomez first argues that Metro unlawfully discriminated against him based upon his national origin when it: 1) filed a written reprimand because of his tardiness and absenteeism in March 2017, and 2) dismissed him in June 2018. As an initial matter, Gomez concedes the June 2018 dismissal claim is no longer viable. (Doc. No. 43 at 1). Title VII prohibits employers from discriminating against any individual on the basis of such individual's national origin. 42 U.S.C. § 2000e-2(a)(1); Risch v. Royal Oak Police Dep't, 581 F.3d 383, 390 (6th Cir. 2009). A plaintiff may prove discrimination through either direct or circumstantial evidence. See Weeks v. Michigan Dept. of Comty. Health, 587 F. App'x 850, 855 (6th Cir. 2014). Direct evidence is evidence that proves intentional discrimination without making any inference, such as "[a]ny discriminatory statements . . . from decisionmakers . . . ." Flones v. Beaumont Health System, 567 F. App'x 399, 404 (6th Cir. 2014). Here, Gomez does not rely upon a direct evidence claim and even concedes that Ms. Smith, despite her title, was "not empowered to take tangible employment actions against

Plaintiff." (Doc. Nos. 46 at 4; 36-1).

Instead, the oft-cited burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as refined by Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981), governs discrimination claims reliant upon circumstantial evidence. "Under this framework, the plaintiff must first make out a *prima facie* case" of discrimination. Rogers v. Henry Ford Health Sys., 897 F.3d 763, 772 (6th Cir. 2018). The burden then 'shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision." Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009). If the employer does so, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the reasons offered by the employer were pretextual." Id.

To establish a prima facie case of discrimination, Gomez must show that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the position or was performing it satisfactorily; and (4) he was treated differently from a similarly situated person outside the protected class. See Vickers v. Fairfield Medical Center, 453 F.3d 757, 762 (6th Cir. 2006).

Gomez argues that Metro's March 2017 written reprimand arising from his tardiness and absenteeism were based on his national origin. (Doc. No. 17 at ¶ 6). While Gomez appears to abandon this argument in his Response to Defendant's Motion for Summary Judgment, (Doc. No. 43), the Court nonetheless notes that such a claim would fail to establish a prima facie case for employment discrimination because the reprimand was not a materially adverse employment action. Courts have typically limited adverse employment action to instances relating to "discharge, demotions, . . . and failure to promote." Sensabaugh v. Halliburton, 937 F.3d 621, 628 (6th Cir. 2019), cert. denied, 140 S Ct. 1116 (2020). Generally, "increased surveillance and

7

discipline, whether warranted or not, do not constitute a material adverse change in the terms of employment in the discrimination context because those actions do not constitute [] a significant change in employment status." Golden v. Metro. Gov't of Nashville & Davidson Cty., 263 F. Supp. 3d 684, 691 (M.D. Tenn. 2017) (citing Lee v. Cleveland Clinic Found., 676 F. App'x 488, 494 (6th Cir. 2017)). Here, Gomez received a written reprimand following a "pattern of failing to report to work through excessive absenteeism, tardiness, and unreliability." (Doc. Nos. 36-3; 46 at ¶ 2). At no time did the written reprimand change the terms and conditions of his employment. His pay, benefits, status, and opportunities remained unchanged after the reprimand. See White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008) (noting that employment actions are not adverse where they fail to impact "an employee's wages or salary"). This reprimand simply does not rise to the level of an adverse employment action to establish a prima facie case of discrimination. See Birch v. Cuyahoga County Probate Court, 392 F.3d 151, 169 (6th Cir. 2004) (finding that "increased scrutiny" is "not tantamount to any kind of change in [Plaintiff's] employment status" such that it constituted an adverse action). Defendant is therefore entitled to summary judgment on Gomez's claim that Metro's March 2017 written reprimand was based on national origin discrimination.

### 2. Hostile Work Environment

Gomez next argues that Metro subjected him to a hostile work environment based on his national origin. To establish a claim for hostile work environment under Title VII, a plaintiff must allege that "(1) [he] belongs to a protected class; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on [national origin]; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassment and failed to take action." Khalaf v. Ford Motor Company, 973 F.3d 469, 482 (6th Cir.

8

2020) (internal citations omitted). The Sixth Circuit has stressed that there is a "relatively high bar" for what constitutes discriminatory behavior under a hostile work environment claim. See Khalaf, 973 F.3d at 482. "[O]ccasional offensive utterances do not rise to the level required to create a hostile work environment because, to hold otherwise would risk changing Title VII into a code of workplace civility." Phillips v. UAW Int'l, 854 F.3d 323, 327 (6th Cir. 2017).

When evaluating such claims, courts examine "the totality of the alleged [] harassment to determine whether it was sufficiently severe or pervasive to alter the conditions" of employment. Phillips, 854 F.3d at 327; see also Fuertes v. Ford Motor Co., 2009 WL 395452, at *9-10 (W.D. Ky. Feb. 17, 2009), aff'd, 354 F. App'x 261 (6th Cir. 2009). The United States Supreme Court has suggested factors for courts to consider when assessing hostility, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Courts must also employ both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000).

Here, Metro argues that the "I hate Hispanic" email allegedly sent by Ms. Smith fails to rise to the level of "severe or pervasive" discriminatory conduct because it was an isolated remark (Doc. 40 at 5). Moreover, Metro suggests that because Gomez failed to inform anyone about the email for several weeks, it does not carry the sufficient indicia of hostility. (Id.; Doc. No. 36-3 at 8-9). In response, Gomez argues that the email instead embodies the discriminatory animus underlying Ms. Smith's consistent, "harassing conduct." (Doc. No. 43 at 10). Gomez also argues

9

that Ms. Smith's conduct was subjectively embarrassing and humiliating, and, as borne out by his proffered medical reports, had an adverse impact on his physical and mental health. (Id. at 9; see also Doc. 44 at 3). Further, Gomez argues that Ms. Smith's conduct was objectively hostile, given her near constant supervision of his bathroom use and attempts to discuss it in front of his co-workers. (Doc. No. 43 at 10).

The Court has reviewed Gomez's declarations and exhibits, which, if shown to be true, could reasonably support a jury verdict that Gomez was subjected to a hostile work environment based on his national origin. Metro argues that because the "I hate" email was not sent until months after Ms. Smith's supervision of Gomez's bathroom use, it cannot be considered evidence of a hostile work environment. (Doc. No. 49 at 1-2). However, courts have inferred unlawful animus from conduct that is not overtly prejudicial, such as the bathroom scrutiny here, when the context dictates it. See Ladd v. Grand Trunk Western R.R., 552 F.3d 495 (6th Cir. 2009). Gomez's declaration states that he received mental health counseling because of Ms. Smith's conduct. (Doc. No. 44 at 3). Additionally, Gomez's co-worker, Renee Buford observed the toll that Ms. Smith's conduct was taking on him emotionally, and that such scrutiny was not applied to other employees. (Doc. No. 45 at ¶¶ 7-9). Gomez also submitted as exhibits dozens of emails in which he tracked the late arrival times of various co-workers, apparently without similar reproach by Ms. Smith. (Doc. 47-2). And, although Metro argues that its HR department took corrective action by investigating the "I hate" email and concluding that it was "highly unlikely that [Ms. Smith] sent" it, (Doc. No. 46 at 3), Gomez counters that the investigation neither alleviated the hostile environment nor aided the emotional toll such an environment took on him. (Doc. Nos. 43 at 4; 44 at 3).

Viewing the above evidence in the light most favorable to Gomez, the Court finds that

Gomez has put forth sufficient evidence for a reasonable juror to conclude he was subjected to a hostile work environment based on his national origin. Accordingly, the Court will deny Metro's claim for summary judgment on this ground.

### B. DISABILITY DISCRIMINATION

As a preliminary matter, the only claim for disability discrimination that Gomez has not abandoned in his response to Metro's Motion for Summary Judgment is the one arising out of his June 2018 dismissal. "[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." Brown v. VHS of Mich., Inc., 545 F. App'x 368, 372 (6th Cir. 2013) (citing Hicks v. Concorde Career Coll., 449 F. App'x 484, 487 (6th Cir. 2011)). Accordingly, the Court will treat all other disability discrimination claims by Gomez as abandoned.

The same McDonnell Douglas burden shifting framework applies to claims under the ADA as for Title VII claims. See Talley v. Family Dollar Stores of Ohio, Inc., 542 F.3d 1099, 1105 (6th Cir. 2008). Gomez must first establish a prima facie case of disability discrimination, Metro must then proffer a legitimate, nondiscriminatory reason or its actions, and Gomez must then show that the employer's stated rationale is pretextual. See id.; see also Ferrari v. Ford Motor Co., 826 F.3d 885, 892 (6th Cir. 2016).

To establish a prima facie case of disability discrimination under the ADA, Gomez must show that he: 1) "was disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." Whitfield v. Tenn., 639 F.3d 253, 259 (6th Cir. 2011).

11

Here, the parties do not dispute that Gomez satisfied the first, third, and fourth elements of his prima facie case. Rather, they disagree on the second element, whether Gomez was "otherwise qualified" for the position of OSR III. (Doc. Nos. 43 at 11-14; 49 at 2-4). Gomez argues that he was qualified to work with a reasonable accommodation. (Doc. No. 43 at 12). He alleges that his physician proposed a reasonable accommodation – leave until June 19, rather than May 1 as the parties discussed in mediation. (Id.). Metro responds that because Mr. Gomez eventually requested an indeterminate leave, he was not capable of working at all – and therefore, was not qualified for the position. (Doc. No. 40 at 14). But the Sixth Circuit has recognized that unpaid leave can constitute a reasonable accommodation under the ADA. See Cehrs v. Northeast Ohio Alzheimer's Research Ctr., 155 F.3d 775, 782 (6th Cir. 1998). In Cehrs, the Sixth Circuit explained that an employer's requirement that an employee is only qualified through "uninterrupted attendance . . . improperly dispenses with the [McDonnell Douglas] burden-shifting" framework. Id. (citing Monette v. Electronic Data sys. Corp., 90 F.3d 1173, 1186 n. 12 (6th Cir. 1996)). Moreover, Gomez has presented evidence that he was willing to return to work. (Doc. No. 47-8). In a May 23 email to his then-supervisor, Ryan Westbrooks, Gomez asked whether he should return to work during his administrative appeal of Metro's decision to terminate his employment. (Id.). Accordingly, the Court finds that Gomez has created a genuine issue of fact regarding whether he was "otherwise qualified," despite his requests for leave. Id.[1]

As for the fifth element, Gomez rebuts Metro's challenge by alleging that his replacement was a "non-disabled worker," and there is no evidence to the contrary. (Doc. No. 43 at 12 n. 3).

---

[1] Gomez and Metro debate whether Metro had an affirmative duty to "engage in an interactive process with Mr. Gomez to determine whether a reasonable accommodation could be achieved." (Doc. Nos. 43 at 13; 49 at 3). However, both parties overlook the law of this circuit that "failure to engage in the interactive process does not give rise to an independent claim" under the ADA. Thompson v. Fresh Products LLC, No. 20-3060, 2021 WL 139685, at *10 (6th Cir. Jan. 15, 2021).

12

Accordingly, the Court finds that, taking the facts in the light most favorable to him, Gomez establishes a prima facie case for disability discrimination under the ADA.

Metro then proffers evidence that it was justified in terminating Gomez because of the myriad performance issues for which he had been reprimanded on several occasions. (Doc. No. 40 at 15). Among these issues, Metro notes that Gomez violated several civil service rules, including: 1) Rule 2.4's prohibitions on outside employment, arising from Gomez's alleged conflict of interest in opening a restaurant while working as a Metro employee; and 2) Rules 5.3 and 6.4's prohibitions on absence without leave, notification, or approval, arising from his failure to seek prior approval before missing work on several days in May after exhausting his FMLA leave. (Doc. No. 49 at 4). Accordingly, the Court finds that Metro has met its burden at this stage of the McDonnell Douglas framework, particularly given that the bar for an employer to proffer a legitimate, non-discriminatory reason is not onerous. See Ferrari, 826 F.3d at 895; Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014) (noting the burden for the employer is one of "production").

Thus, the burden shifts back to Gomez to establish through admissible evidence that Metro's proffered legitimate, non-discriminatory reason is mere pretext. See Ferrari, 826 F.3d at 892. "To survive a motion for summary judgment, [a plaintiff] need not definitely prove that [the employer's] reason is pretextual, but rather must prove only enough to create a *genuine issue* as to whether the rationale is pretextual." Id. at 896 (emphasis supplied) (citations omitted). The Sixth Circuit allows a plaintiff to establish pretext in "three interrelated ways: (1) that the proffered reasons had no basis in fact, 2) that the proffered reasons did not actually motivate the employer's action, or 3) that they were insufficient to motivate the employer's action." Id. (citing Romans v. Mich. Dep't of Human Servs., 668 F.3d 826, 839 (6th Cir. 2012)). Here, Gomez argues that

13

Metro's proffered reasons are pretextual because they have no basis in fact. (Doc. No. 43 at 13). Gomez argues that he promptly supplied doctor's notes for the three consecutive days missed in May, and that he was informed he need not return to work until later contacted. Id. Moreover, Gomez contends that there was no conflict of interest with his family's restaurant, as he was merely an investor, rather than an employee. Id. at 14. The Court finds that Gomez has created a "genuine issue" as to whether Metro's rationale is pretextual. Ferrari, 826 F.3d at 895. Accordingly, the Court denies Metro's claim for summary judgment on this ground.

### C. RETALIATION

Last, Gomez contends that his June 2018 dismissal by Metro constituted unlawful retaliation in response to his April 5, 2018 internal discrimination complaint. (Doc. No. 43 at 14). However, Gomez improperly brings this retaliatory termination claim for the first time in his response to Metro's summary judgment motion. "A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d. Supp. 2005); see also Tucker v. Union of Needletrades, Indus., & Textile Emples., 407 F.3d 784, 788 (6th Cir. 2005).

The Sixth Circuit has rejected instances where a non-moving party plaintiff introduces factually distinct claims for the first time at the summary judgment stage. In Desparois v. Perrysburg Exempted Vill. Sch. Dist., for example, the plaintiff raised new factual claims for the first time at the summary judgment stage but knew of such facts when he filed the complaint and amended complaint. 455 Fed. App'x 659, 667 (6th Cir. 2012). The court found that "[b]ecause the new claims are factually distinct from the original claims, [Defendant] had no notice that it would have to defend against such allegations." Id. Like the plaintiff in Desparois, Gomez raises a new

14

theory for relief – retaliatory termination – at the summary judgment stage: he claims that Metro's decision to terminate his employment arose from his April 5, 2018 internal complaint of discrimination. (Doc. No. 43 at 14-15). But his retaliatory termination claim is nowhere in the complaint or amended complaint. Nor did Gomez otherwise incorporate this claim into his other retaliation claims, despite specifically mentioning the April 5, 2018 complaint elsewhere. (Doc. No. 17 at ¶ 8). Summary judgment is not the stage of litigation to raise a new retaliation claim. See Desparois, 455 Fed. App'x at 667 (finding Plaintiff's factually distinct claims at the summary judgment stage to be insufficient where Plaintiff failed to include them in either his original or amended complaint). The Court notes that Gomez even conceded his original, factual grounds for retaliation in his response to Metro's Statement of Material Facts. (Doc. No. 46 at ¶ 37). Accordingly, the Court finds that summary judgment should be granted to Metro on Gomez's retaliation claim arising from his June 2018 dismissal.

## D. CONCLUSION

For the foregoing reasons, Metro's Motion for Summary Judgment (Doc. No. 36) will be denied as to Gomez's claims for hostile work environment and disability discrimination. The motion will otherwise be granted.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE